# Sovereign Bank v. Berks County Bd. of Assessment Appeals

*Joseph Patrick O'Brien,* for appellant.
*Edwin L. Stock,* for appellee.
*James M. Lillis,* for intervenor.

LASH, *J.,* January 25, 2011—The appellant, Sovereign Bank (hereinafter "Sovereign"), has filed an appeal from the decision entered by the Berks County Board of Assessment Appeals (hereinafter board") assessing real estate owned by Sovereign at nine hundred eighty-nine thousand dollars ($989,000.00), effective January 1, 2010 for city and county taxes and July 1, 2010 for school taxes. A de novo trial reviewing assessments for 2010 and 2011 was held on December 28, 2010. The court enters the following findings of fact:

## I. FINDINGS OF FACT

1. The appellant, Sovereign Bank (hereinafter "Sovereign"), is a banking institution maintaining a mailing address at P.O. Box 14115, Reading, Berks

County, Pennsylvania 19612-4115.

2. The appellee, Berks County Board of Assessment Appeals (hereinafter "board"), is located at the Berks County Services Center, Third Floor, 633 Court Street, Reading, Berks County, Pennsylvania 19601.

3. Intervenor, Wyomissing Area School District (hereinafter "School District"), is a school district with its administrative office located at 630 Evans Avenue, Wyomissing, Berks County, Pennsylvania 19610-2636. School district filed a notice of intervention on December 16, 2009.

4. Sovereign is the legal owner of real estate located at 840 Penn Avenue, Wyomissing Borough, Berks County, Pennsylvania (hereinafter "property"), parcel identification number 96-5307-17-00-2018.

5. The land area of the property is approximately 31,150 square feet, improved with a building used as a bank branch and associated general office use. The building size contains 12,300 square feet, 8,200 square feet above grade and 4,100 square feet below grade. The building was constructed in 1980.

6. The building is located in the Wyomissing Area School District, in an area zoned TC, Township Center Residential/Office District.

7. The subject building is a two-(2) story brick structure. The entire building is occupied by Sovereign Bank. The first floor is the bank branch operations, while the second floor is used by the bank for general office

purposes. The basement finished area is used mainly for storage purposes at this time. Heating for the building is gas forced warm air, and the entire structure is centrally air conditioned.

8. The first floor of the building houses the bank's daily business traffic. There are five (5) teller windows, the drive up window and an ATM room. There are four (4) private offices sectioned by partition walls, conference room and reception/waiting area. This floor is mainly carpeted.

9. The second floor of the building houses the bank's general office area along with a break/file room area. There are six (6) private offices sectioned by partition walls and cubicle work stations. The floor is mainly carpeted in the office area, with tile in the break/file room.

10. The basement of the building is finished area. There is a break room, several storage areas and a private office.

11. There is also a 1,000 pound elevator located on the west side of the building, servicing the three (3) floors of the building.

12. Sovereign filed an appeal of its assessment on July 30, 2009. The matter proceeded to the board who, after hearing held, issued a notice, dated October 30, 2009, assessing the property at nine hundred eighty-nine thousand dollars ($989,000.00). The assessment figure is based upon a fair market value of one million four hundred sixty thousand eight hundred fifty-six dollars

($1,460,856.00), reduced by common level ratio.

13. On or about November 30, 2009, Sovereign appealed the board's decision to the common pleas court.

14. The years in question for this appeal are 2010 and 2011. The Berks County common level ratio for tax year 2010 is .677 and for 2011 is .701.

## II. DISCUSSION

The issue before this court is the fair market value of the premises. Actual or market value is defined as "the price which a purchaser, willing but not obligated to buy, would pay an owner, willing but not obligated to sell, taking into consideration all issues to which the property is adapted and might in reason be applied." *F & M Schaeffer Brewing Company v. Lehigh County Board of Appeals*, 610 A.2d 1, 3, 530 Pa. 451, 457 (1992) (citation omitted).

In support of their respective positions, each party presented testimony by an appraiser expressing an opinion of fair market value. Sovereign's expert was Paul W. Shoup, Jr., a Pennsylvania certified general real estate appraiser, who valued the fair market value of the property, as of August 1, 2009, to be seven hundred fifty thousand dollars ($750,000.00). The board and school district jointly retained Douglas A. Haring, MAI, SRA, who found the fair market value of the property to be one million four hundred eighty thousand dollars ($1,480,000.00) as of August 15, 2009 and August 15, 2010.

The court's function is not to independently value the property, but to determine the value based on competent and

credible evidence. *Appeal of F. W. Woolworth Company*, 235 A.2d 793, 795, 426 Pa. 583, 586 (1967). When there are conflicting experts, the court may accept all, none or part of an expert's testimony, part of one expert's testimony and part of another's. *Appeal of Avco Corporation*, 515 A.2d 335, 338, 621 (Pa. Super. 1986). In determining actual value, three approaches to valuation are to be used: cost (reproduction over placement, as applicable, less depreciation in all forms of obsolescence), comparable sales, and the income approach. 72 P.S. §5020-402, 5348(d), *F & M Schaeffer Brewing Company*, 610 A.2d at 3. In considering the weight to be given to various approaches to valuation, a trial court has discretion to determine which of the conflicting methods (cost, comparable sales or capitalized income) is the fairest and most reasonable for a particular property. *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes*, 639 A.2d 1302, 1303 (Pa.Cmwlth. 1994), allocatur denied, 539 Pa. 669, 652 A.2d 839 (1994).

Sovereign's appraiser relied solely on the comparable sales approach, stating he was unable to obtain sufficient data to project income for this property and finding the cost approach to be impractical. School district's appraiser applied the sales comparison and income approach, also declining to apply the cost approach.

Due to an issue raised at trial, we will initially address the assessment for 2011. As stated, the within matter is an appeal from the 2010 assessment of the property. During the pendency of the appeal, the 2011 assessment took place. As provided for in § 5350(c) of the general

county assessment law,[1] the within appeal also operates as an appeal of the 2011 assessment. This point of law was recognized by all parties at time of trial.

At the commencement of trial, the parties stipulated that the board's assessment of nine hundred eighty-nine thousand dollars ($989,000.00) could be admitted into evidence. Accordingly, a prima facie case for the validity of the assessment was established. The burden of proof then shifted to Sovereign to provide sufficient evidence to rebut the validity of the assessment. *Deitch Company v. Board of Property Assessment*, 417 Pa. 213, 209 A.2d 397 (1965); *Strawbridge & Clothier v. Board of Assessment Appeal of Delaware County*, 492 A.2d 108, 110 (Pa. Cmwlth. 1985).

Sovereign's appraiser provided an opinion on fair market value for the 2010 tax year, but candidly stated that he could not provide an opinion on value for tax year 2011. In addition, no other evidence on fair market value for tax year 2011 was provided by Sovereign. Sovereign Bank thus failed to meet its burden to challenge the 2011 assessment. Accordingly, we accept the board's assessment for 2011, set at nine hundred eighty-nine thousand dollars ($989,000.00), representing fair market value of one million four hundred ten thousand eight hundred forty-one dollars and sixty cents ($1,410,814.60) discounted by the common level ratio of .701.

---

1. 9(c) of the act of June 26, 1931, P.L. 1379, as amended, 72 P.S. § 5350(c).

We turn then to the 2010 tax year. Sovereign's appraiser opined that if the subject property were placed up for sale, it would likely be marketed as a commercial office building, not as a bank, even though the property's sole function since the building's construction has been banking. He noted that a typical bank building in 2010 is a single story building of new or newer construction, fitted out specifically for bank purposes. The subject property, however, more closely resembles a professional office building, whose tenants might include, for example, doctors, lawyers, or accountants. Additionally, Sovereign's appraiser was reluctant to use bank branches as comparables, because of his concern that those transactions do not properly reflect fair market value. He noted that sales of bank branches are often sales/lease back transactions, where the seller's motive is to obtain an infusion of capital, selling off several bank branches at one time. Accordingly, in choosing his comparables, Sovereign's appraiser predominately selected sales of properties which he felt were most closely aligned with this perspective, although two (2) of his comparables housed banks.

Sovereign's appraiser selected nine (9) commercial office buildings, ranging in size from 5,016 square feet to 22,492 square feet, reflecting selling prices ranging from twenty-two dollars and fifty cents ($22.50) per square foot of building area, including the land, to seventy-one dollars and ninety-two cents ($71.92) per square foot. The average selling price of the comparables was fifty-one dollars and sixty-nine cents ($51.69) per square foot

building area, and the median was fifty-seven dollars and nineteen cents ($57.19). Deducting the two (2) lower selling prices, the average selling price became fifty-eight dollars and eighty-three cents ($58.83) per square foot, and the median would be sixty dollars and eighteen cents ($60.18) per square foot.

As stated, of the nine (9) comparables, two (2) house banking operations. Comparable no. 1, located in the borough of Shoemakersville, was an older two- (2) story building occupied by Fleetwood Bank. Comparable no. 5, located in the city of reading, is a multi-tenant building, with the non-profit Berks County Center for Independent Living renting most of the area. However, Fulton Bank also maintains operations there.

The remainder of the buildings include multi-tenant office buildings, a law firm, a commercial office building whose main tenant is a school for autistic youth, and a smaller retail building.

Sovereign's appraiser then performed a qualitative analysis, reviewing the similarities and differences of the comparables to the subject property. From this study, he concluded that the fair market value for the property, including the partially finished basement area, would be sixty dollars ($60.00) per square foot of building area, including the land. Multiplying that figure by his measurement of 12,462 square feet[2] of building area, he

2. School district's appraiser had a different measurement of square footage, identifying total square footage of 12,300, being 8,200 square feet for the first and second floors and 4,100 square feet for the basement

reached a value of seven hundred forty-seven thousand seven hundred twenty dollars ($747,720.00), which he rounded to seven hundred fifty thousand dollars ($750,000.00).

School district's appraiser presented a different opinion on highest and best use, opining that the subject property would be marketed for "continued use as a bank branch with associated general office use." He noted that the location was optimal for a bank, featuring high visibility and high traffic volume. He also noted that the subject property was one of the most productive branches of Sovereign, a strong indicator that a prospective buyer seeking a property for bank purposes would give much consideration toward the purchase of this property.

School district's appraiser then searched for two (2) types of comparables, one involving similar banking institutions which could provide him with a fair market value for the first floor, as well as commercial office buildings for the analysis of the second floor. He identified eight (8) comparables, including three (3) bank branches, three (3) medical office buildings, one (1) professional office building, and a commercial office building. He also included one offering for sale, a professional office building located in the Borough of Wyomissing, close to the subject property.

In searching for comparable banking establishments,

---

area. This court accepts school district's appraiser's figures, being the lower figure.

school district's appraiser did not avoid sale/lease back transactions, believing that in the Berks County area, under certain circumstances, these transactions could provide an appropriate figure of fair market value. The banks chosen contain roughly the same square footage as the first floor of the subject property, all located in Berks County.

Regarding the commercial establishments, school district's appraiser sought property comparables in close proximity to the location of the subject property where the market region would be similar.

School district's appraiser then employed both a qualitative and quantitative analysis. Regarding the bank branch comparables, the average sale price per square foot was four hundred twenty-seven dollars ($427.00). He made a forty percent (40%) downward adjustment due to the superiority of the comparables, resulting in an adjusted sale price per square foot of two hundred fifty-six dollars and twenty cents ($256.20) per square foot. Multiplying this by the first floor square footage of 4,100 square feet, he reached a figure of one million fifty thousand dollars ($1,050,000.00). Regarding the second floor office space, the commercial office square footage of the comparables averaged one hundred twenty dollars ($120.00) per square foot. He also found these comparables to be superior, making a twenty percent (20%) downward adjustment, for an adjusted sale price of ninety-six dollars ($96.00) per square foot. Multiplying this by 4,100 square feet, he reached a figure of three hundred ninety-three thousand six hundred dollars ($393,600.00). Adding one million

fifty thousand dollars ($1,050,000.00) to three hundred ninety-three thousand six hundred dollars ($393,600.00), the adjusted sale price came to one million four hundred forty-three thousand six hundred dollars ($1,443,600.00), which he rounded off to one million four hundred fifty thousand ($1,450,000.00), or one hundred seventy-seven dollars ($177.00) per square foot. He did not provide any additional value for the 4,100 square foot basement area, which was unoccupied for several years and primarily used for storage. Accordingly, his opinion based on the sales comparison approach was one million four hundred fifty thousand dollars ($1,450,000.00).

For the income approach, school district's appraiser again assumed that a prospective buyer would utilize the first floor for banking functions and the second floor for general offices. From his database, compiled over several years, he identified several rentals for both bank branches and general office space. He assumed a triple net rent and one hundred percent (100%) occupancy. He deduced that an appropriate rental would be thirty-seven dollars ($37.00) per square foot for the bank level and eight dollars and fifty cents ($8.50) for the second floor general office. He did not anticipate that the basement area would provide rental income, although there would be some utility to this area serviceable to the tenants. The total potential income at one hundred percent (100%) occupancy would be one hundred eighty-six housand five hundred fifty dollars ($186,550.00). He then deducted estimated expenses, six percent (6%) for vacancy and credit loss, then an

additional six percent (6%) for management and leasing. Replacement reserve was estimated at two dollars ($2.00) per square foot of building area for the 8,200 square feet. He estimates the total annual expense to be twenty-six thousand nine hundred twenty-one dollars ($26,921.00), for a net operating income of one hundred forty-eight thousand four hundred thirty-six dollars ($148,436.00).

School district's appraiser then assumed a capitalization rate of 9.57 percent, based on a survey of mortgage lenders and investors. This results in a fair market value of one million five hundred fifty thousand dollars ($1,550,000.00). However, he made an adjustment because there are currently no tenants in the subject property, the building being owner occupied. Accordingly, the leasing process, estimated to be approximately six (6) months in duration, would result in a loss of income of approximately seventy thousand dollars ($70,000.00). Subtracting this from one million five hundred fifty thousand dollars ($1,550,000.00), he found a net value of one million four hundred eighty thousand dollars ($1,480,000.00).

School district's appraiser then performed a reconciliation, giving greater weight to the income approach due to the quantity of available data for rental rates for both bank branches and office buildings. He then accepted the income approach figure of one million four hundred eighty thousand dollars ($1,480,000.00) as his final value on fair market, as of August 15, 2009.

School district's appraiser performed a similar analysis

for 2011. He searched for additional data accruing since May 15, 2010, the date he performed his analysis for 2010, but was unable to find anything of substance. Accordingly, he accepted the 2010 analysis as appropriate for 2011.

The primary issue in this appeal concerns highest and best use; i.e., whether the subject property could be marketed as a bank, commanding a higher price per square foot than would occur if prospective buyers would only be interested in utilizing the property for office purposes. Highest and best use has been defined as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."[3] As such, highest and best use contemplates maximum productivity of the property, as shaped by the competitive forces within the market where the property is located.[4] As stated by the Commonwealth Court in *Pittsburgh - Des Moines Steel Company v. Board of Property Assessment Appeals and Review*, 519 A.2d 1080, 1082 (Pa. Cmwlth. 1987), "one of the most important factors is the use of the subject property -- not only the present use of the property, but all of the uses, including the highest and most profitable use to which the land is adoptable and available. The possible demand for such a use affects the market value" (citations omitted).

Because the cost of space for banking functions, whether

---

3. The appraisal of real dstate, eleventh edition, Appraisal Institute, p. 297.
4. *Id.* at p. 298.

through sale or rental, is higher than that for general office space, the highest and best use would be for banking, if the property could feasibly be marketed as a bank. Of course, the fact that the current use of the property, and the sole use since the construction of the building, has been for banking functions supports the prognosis that the property could continue to be used as a bank and would be attractive to prospective buyers for that purpose. All of the necessary facilities are present. There would be no legal impediments to this continued use. The fact that this branch has been highly productive for Sovereign also supports this conclusion.

The primary reason against marketing the property as a bank relates to its obsolescence. The building is at least thirty (30) years old. A prospective buyer might require modernization of or retrofitting to accommodate 21st Century banking. Additionally, the second floor, as well as the basement, would be unnecessary for banking functions, and would be an unnecessary cost outlay to a prospective buyer.

We note, however, that there could be impediments to utilizing the building for general office space. School district's appraiser pointed out that his comparable no. 6, the offering for sale of a professional office building in close proximity to the subject property, has had difficulty selling, with the price being reduced from seven hundred ninety-five thousand dollars ($795,000.00) to six hundred ninety-five thousand dollars ($695,000.00). He opined that the primary obstacle to a sale is a zoning

requirement requiring a certain number of parking spaces to accommodate the tenants. Apparently, comparable no. 6 did not have sufficient parking spaces if the property is fully occupied. School district's appraiser raised the concern that the subject property could possibly face the same problem if the property was used for multi-tenant occupancy.

Upon review, this court is satisfied that the property can be marketed as a bank. Given the premium and price per square foot, it is certainly advisable that a broker would make every effort to market the property as a bank. The high visibility and high traffic volume, the setting being in an area where several other professional office buildings, commercial establishments and retail sales are present, and the high level of productivity over the years, support the concept that a bank in that location could continue to thrive, even if owned by a bank other than Sovereign. The bank has been a longstanding, effective presence in the community, and able to continue as such. The test of highest and best use is met. Accordingly, we accept school district's appraiser's conclusion that the first floor can be marketed for banking purposes and the second floor for general office purposes.

The next dispute concerns whether a price per square foot should be attributed to the basement area. The appraisers describe the basement in a similar manner, establishing that the basement would be of limited utility, available for storage for perhaps a kitchenette area. School district's appraiser stated that the presence of the basement

would add no value to a prospective buyer and, therefore, based his calculation on the square footage of the upper two (2) levels, totaling 8,200 square feet. On the other hand, Sovereign's appraiser, considering the building as a whole, multiplied his price per square foot by the square footage for all three (3) floors.

We find that it is highly unlikely that a prospective buyer would be willing to pay the same price per square foot for substandard space as it would for the space it intends to occupy for a bank or other function. It is much more likely that no value would be attributed to the basement, as proposed by school district's appraiser. Accordingly, we accept school district's appraiser's decision to calculate price based on 8,200 square feet.

Further, this court's rejection of Sovereign's appraiser's inclusion of the substandard space affects the review of his qualitative analysis. It is unknown whether the selling prices of Sovereign's appraiser's comparables encompassed square footage of substandard space. If we continue to accept his square foot estimate at sixty dollars ($60.00), but calculate by 8,200 square feet, his fair market value would be modified to four hundred ninety-two thousand dollars ($492,000.00), which, based on the other evidence provided, appears to be well below fair market value for a building of this size, quality, and location.

On the other hand, if you accept his overall fair market figure of seven hundred fifty thousand dollars ($750,000.00) for professional office space, and base

that figure on 8,200 square feet, the price per square foot would approximate ninety dollars ($90.00).[5] This figure is not far from school district's appraiser's net price per square foot for commercial office space of ninety-six dollars ($96.00).

Reviewing school district's appraiser's comparables, we find them to be appropriate. However, in addition to the forty percent (40%) downward adjustment employed to account for the superiority of the comparables, an additional discount appears warranted, based upon school district's appraiser's assumption that the property would be marketed as a bank building. If a prospective buyer's purpose for purchasing the building would be for a bank branch, the second floor may not be required or wanted. While the space is valuable and would be a potential money maker as rental space, it is questionable whether a buyer would be in the market for such space or willing to pay full value.

Based on these considerations, this court will accept the lower figure of ninety dollars ($90.00) per square foot for the second floor, or three hundred sixty-nine thousand dollars ($369,000.00).

---

5. Seven hundred fifty thousand dollars ($750,000.00) divided by 8,200 square feet equals ninety-one dollars and forty-six cents ($91.46). However, the figure of seven hundred fifty thousand dollars ($750,000.00) was rounded from seven hundred forty-seven thousand seven hundred twenty dollars ($747,720.00). Further, the square footage measurement employed by Sovereign's appraiser was 12,462 feet. As we are basing our calculations on school district's appraiser's square footage estimate of 4,100 square feet per floor, the ninety dollar ($90.00) per square foot estimate is a better estimate than ninety-one dollars and forty-six cents ($91.46).

Turning then to the assessment of the square foot value for the first floor, we find that school district's appraiser's comparables 7, 8, and 9 are the type of bank buildings described by Sovereign's appraiser as prototypical. The banks are stand alone buildings with one (1) floor used for the banking services, featuring sufficient parking and drive-in areas, and situated adjacent to a well-travelled roadway. Comparable numbers 8 and 9 are of modern construction. All three (3) comparables are superior to the subject property, warranting a downward adjustment. The adjustment made by school district's appraiser of forty percent (40%) is substantial. School district's appraiser deems the downward adjustment sufficient. As there was no countervailing evidence or successful challenge to the analysis, this court accepts the three (3) comparables as appropriate.

Reviewing Sovereign's appraiser's comparables, comparable no. 1, the Fleetwood Bank, appears to be, of all the comparables submitted by either appraiser, to be the comparable that most closely resembles the subject property. It is not a prototypical bank of new construction, it is a two- (2) story facility, with the second floor being used for general office functions, similar to the subject property. Comparable no. 1 is inferior, however, to the subject property, being constructed in 1890, and being located in an outlying area of Berks County. Unfortunately, sovereign's appraiser made no quantitative adjustments so the differential between the comparable and the subject properties cannot be appreciated based upon the evidence.

Accordingly, this court cannot properly evaluate the price per square footage for comparable no. 1, in relation to school district's comparables.

Nevertheless, it is apparent that of the four (4) comparables being considered, Sovereign's comparable no. 1 would command the lowest price per square foot. Employing a median analysis, Sovereign's comparable no. 1, with the lowest price per square foot, and school district's comparable no. 9, with the highest price per square foot, would be stricken. Averaging the price of comparable sale no. 9 and comparable sale no. 8, the average price per square foot would be four hundred four dollars ($404.00). Making the forty percent (40%) downward adjustment, the adjusted price per square foot would become two hundred forty-two dollars and twenty-six cents ($242.26). Multiplying this by 4,100 square feet, the price per square foot for the first floor would be nine hundred ninety-three thousand two hundred sixty-two dollars ($993,262.00).

Adding nine hundred ninety-three thousand two hundred sixty-two dollars ($993,262.00) to three hundred sixty-nine thousand dollars ($369,000.00), the fair market value becomes one million three hundred sixty-two thousand two hundred sixty-two dollars ($1,362,262.00), which this court finds appropriate.

Our next consideration is the appropriateness of the income approach. Sovereign's appraiser declined to employ the income approach based on a lack of data. School district's appraiser, on the other hand, testified that

he had more than sufficient data, based on compilations in his data base, to utilize the income approach. However, the data, for the most part, was not received into evidence. The evidence that was received provided a cursory overview of the information considered by school district's appraiser. In other respects, the foundation reached upon for the conclusions reached by school district's appraiser was not provided at all. For example, he stated that he had assumed a capitalization rate of 9.57 percent, based on a survey of mortgage lenders and investors, but did not provide the names of the lenders or investors, the data received from them, or any calculations. While there is nothing in the record to suggest that the conclusions reached by school district's appraiser are not credible, this court would have appreciated the opportunity to evaluate the conclusions based on a review of the foundation from which the conclusions are built. Accordingly, this court places weight on the comparable sales approach and accepts the figure of one million three hundred sixty-two thousand two hundred sixty-two dollars ($1,362,262.00) as fair market value. Multiplying by the common level ratio of .677, the assessed value for 2010 becomes nine hundred twenty-two thousand two hundred fifty-one dollars and thirty-seven cents ($922,251.37), which this court rounds off to nine hundred twenty-two thousand two hundred fifty dollars ($922,250.00).

We enter the following order:

## ORDER

And now, January, 25 2011, upon consideration of the

within appeal and after a de novo trial held, it is ordered that the actual market value of the property owned by appellant, Sovereign Bank, and situated in the Wyomissing School District, with an address of 840 Penn Avenue, Wyomissing Borough, Berks County, Pennsylvania 19610, parcel identification number 96-5307-17-00-2018, is set at one million three hundred sixty-two thousand two hundred sixty-two dollars ($1,362,262.00) for calendar year 2010. Applying the common level ratio of .677, the assessed value for tax year beginning January 1, 2010 for county and township taxes and beginning July 1, 2010 for school district taxes is nine hundred twenty-two thousand two hundred fifty dollars ($922,250.00). For calendar year 2011, this court finds fair market value to be one million four hundred ten thousand eight hundred fourteen dollars and sixty cents ($1,410,814.60). After applying common level ratio of .701, the assessment for tax year beginning January 1, 2011 for county and township taxes and beginning July 1, 2011 for school district taxes is nine hundred eighty-nine thousand dollars ($989,000.00).